117 So.2d 295 (1959)
Edward C. MAHFOUZ, Plaintiff-Appellant,
v.
UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA-LOCAL UNION NUMBER 403, et al., Defendants-Appellees.
No. 9093.
Court of Appeal of Louisiana, Second Circuit.
December 22, 1959.
Rehearing Denied January 26, 1960.
Certiorari Denied March 24, 1960.
*296 Alfred A. Mansour, Gravel, Humphries, Sheffield & Fuhrer, Alexandria, for appellant.
Holt & Holt, Alexandria, for appellee.
GLADNEY, Judge.
Edward C. Mahfouz brought this action in tort for damages arising from physical injuries sustained by him on October 24, 1956, when he fell to the bottom of an elevator shaft of a building in the City of Alexandria, owned by the defendant Union. Defendants denied liability and the case was tried upon its merits, after which a judgment was rendered rejecting plaintiff's demands, and the latter perfected an appeal to this court. Prior to a review of the judgment appealed, on November 5, 1959, Mahfouz died and his widow, Mary M. Mahfouz moved for and we granted an order substituting her as party plaintiff in lieu of her late husband, and permitting her to prosecute this action in her own behalf and for the use and benefit of her minor children, Sadie Dianne Mahfouz and Charles E. Mahfouz. Appellees have excepted to the right of Mrs. Mahfouz to prosecute further the cause of action sued upon.
At the time of the accident plaintiff was engaged in the business of buying and selling used stocks of merchandise. In the course of his business he acquired from Champ Baker some restaurant equipment formerly used by an individual who under lease from defendant Union had operated a restaurant in the building. Petitioner then made a deal to sell some of the equipment to John Wheatley and the latter on October 24, 1956, was engaged in moving it from the building. Plaintiff testified he was present at that time for the purpose of seeing the property so conveyed by him was removed and detached from the building without damage to the premises. One of the articles bought by Mahfouz and sold to Wheatley was a stove situated against the rear wall of the restaurant premises with its vent extended through the wall and into the adjoining elevator shaft. This metal vent had been included in the sale to Baker and in the subsequent sales to plaintiff and Wheatley.
The building in question is situated on the corner of Murray and Eighth Streets and is a two-story structure with the upper floor consisting of a meeting hall and offices, one of which is occupied by the defendant Union and the others being rented to tenants. The downstairs portion of the building has three areas, there being in the front part two large spaces separated by a partition wall. The entrances to these two spaces are at the front of the building on Murray Street. The third space, embracing the rear part of the lower floor, consists *297 of a hallway to which entrance is gained from a door on Eighth Street. As one enters this hallway to the left there is a staircase leading to the upper floor; to the right of the hallway is an elevator shaft which is immediately to the rear of the front corner space of the building, these two areas being separated by a wall. Entrance can only be gained to the elevator shaft by opening a solid door which is consistently kept locked. The elevator shaft itself is unlighted and has a depth of approximately six feet from the floor to the hallway. The doors to the Eighth Street entrance are of glass and the hallway is usually during the day illuminated by daylight and two electric lights in the ceiling.
About mid-afternoon of the day of the accident, being desirous of removing the vent which accommodated the stove pipe, Mahfouz went out of the building and around to the Eighth Street entrance and into the hallway above described. He tried to open the door leading to the elevator shaft and after finding it to be locked he went to Baker's office for the key and was directed to the office of the defendant Union. He then returned to the building, went upstairs to the Union office, and spoke to Mrs. Estelle Vandersypen, the office secretary of Lawrence Fuglaar, secretary and business manager of the Union, telling her that he desired to open the door in order to get to the vent. Upon being informed that the key was not immediately handy, Mahfouz went back downstairs and waited at the door. After a slight delay of about five minutes Mrs. Vandersypen came down with some keys and undertook to find the proper one. While this was going on plaintiff stood to the rear and somewhat to the left of Mrs. Vandersypen who eventually unlocked the door and fully opened it. When the door was opened plaintiff walked through the opening and fell into the shaft. Mrs. Vandersypen immediately ran upstairs to enlist the aid of persons there.
Mr. Mahfouz was a large man, weighing in excess of two hundred pounds and had extremely poor vision. Shortly before trial he was examined by Dr. B. M. Wilson, an oculist, who ascertained that his vision was but twenty per cent in his right eye and sixty per cent in his left. As a result of his poor vision Mahfouz wore glasses with thick lenses.
There was stored in the bottom of the elevator shaft a large clothes frame which may or may not have contributed to the injuries received by Mahfouz, who fell into the shaft feet first. As a result of the fall plaintiff sustained a markedly comminuted impacted fracture of the tibia of the left leg. Healing was unsatisfactory and plaintiff received extended hospitalization and medical care and suffered considerably from pain.
The issues tendered for our consideration are: first, the peremptory exception of no cause and no right of action which asserts that the right of action of Edward C. Mahfouz has abated by reason of his death; second, whether defendants are liable for the alleged negligent acts of Mrs. Vandersypen by reason of LSA-C.C. Art. 2320, which provides employers are answerable for the damage occasioned by their servants in the exercise of the functions in which they are employed; third, whether the injuries of Mahfouz were proximately caused by the negligence of Mrs. Vandersypen; and, fourth, but only if negligence of Mrs. Vandersypen is proven, whether vel non Mahfouz was guilty of such contributory negligence as to bar recovery. The arguments so presented are herein discussed seriatim.
The exception of no cause or right of action has for its basis the contention that a personal, nonheritable action for damages in tort abates with the death of the party who instituted it. Since this is a peremptory exception we entertain no doubt as to plaintiff's right to present it to and have it passed upon at this stage of the proceeding. We have concluded, however, that the exception is without merit. LSA-C.C. Art. 2315, Code Practice, Art. 21 as *298 amended by Acts of 1954, No. 57. The latter act declares:
"An action does not abate on death of one of the parties after suit has been filed, and the heirs, legatees, administrator, or executor of the deceased party may be substituted as parties in any case wherein they succeed, by operation of law, to the rights of the deceased party."
LSA-R.S. 13:3349, as amended by Acts of 1954, No. 59, has a similar provision, reading:
"There are no exceptions to the rule that an action does not abate by the death of one of the parties thereto after suit has been filed. This action shall apply to all actions now pending as well as those which may be hereafter instituted. No act of the legislature heretofore passed, nor any acts hereafter passed shall be construed as making an exception to this rule, unless such act specifically and specially makes an exception thereto."
In rejecting plaintiff's demands the trial judge held the defendant Union was not liable for any acts of negligence on the part of Mrs. Vandersypen in opening the door to the elevator shaft at the request of Mr. Mahfouz, finding she was not acting within the exercise of the functions in which she was employed. He reasoned there was a difference between the acts of Mrs. Vandersypen in opening doors for tenants and her act in this case which he said could hardly be reasonably incidental to the conduct which was authorized and that in doing so she performed an accommodation to plaintiff by turning aside from any and all duties express or implied which she was engaged to perform as an office secretary.
The evidence discloses the defendant Union, in addition to its other business activities, was also engaged in the business of operating, maintaining and leasing space in its building and in connection with this activity Fuglaar, its agent and financial secretary, had full authority to lease any part of the building and to perform any acts incidental to or arising out of the nature of this phase of the defendants' business. This surely may be said to include the authority to give any prospective tenant or business guest of either, access to any part of the building where such access is reasonably related to the lease rights, express or implied. Mrs. Vandersypen had the following authority according to the testimony of Fuglaar:
"Q. Does she handle anything at all in connection with the rentals of the property for the various tenants of the Union? A. She only collects the rent, regular secretary work.
"Q. Does she have keys to all of those units that you rent upstairs and downstairs? Where are they kept? A. They are kept in the office.
"Q. She has access to them? A. Yes.
"Q. Is she authorized to use them for the purpose of going in any of the rooms or the areas that are in the building? A. Well, yes, she can use them. Anybody may leave their key at home or something another and want to get in. We have master keys that we use.
"Q. There is no question, Mr. Fuglaar, about her authority to go into any part of the building if it becomes necessary in connection with any of the activities in which the tenants are engaged in or anybody else, is there? A. I don't thinkwell, if anybody comes in and leaves their keys at home and want to get in the door, the key is in my office and she knows where they are and they want to get in there, I don't see no reason why she
"Q. You have never instructed her that she could not open any doors or as a matter of fact when you are not there she has access to the master keys that are in your office to any part of the building, does she not? A. Yes.

*299 "Q. And is fully authorized to use those keys for any legitimate purpose that may come up in connection with the Union's activities? A. Why, certainly.
"Q. As a matter of fact that is one of the things that she has to do when you are away, isn't that correct? A. Well, it doesn't happen too many times, but like I say, if somebody comes in there and they left their key at home and they want to get in their office, we have the janitor's key in my office there and if they come there and ask her to open the door, she opens it.
"Q. She is fully authorized to do that? A. Well, she has never been authorized, but she does.
"Q. She has done it ever since the building was over there, when she came there? A. Yes, sir.
"Q. You've never told her not to do it? A. (No answer recorded)"
Mrs. Vandersypen testified:
"Q. In what capacity are you employed by the Union? A. Secretary.
"Q. Secretary to whom? A. To the Carpenter's Union.
"Q. Are you the secretary to the Union or the secretary to Mr. Fuglaar, who is the business agent? A. Well, Mr. Fuglaar, in the name of the Union.
"Q. Is your position secretary to the Union, do you hold that official position with the Union? A. Well, to Mr. Fuglaar and the Union.
"Q. In other words, as far as your employment is concerned, you are the secretary to Mr. Fuglaar as business agent and you are also secretary to the defendant Union? A. Yes.
"Q. And that's the understanding that you have of your position and you have been in that position for as long as Mr. Fuglaar has been the business agent? A. That's right.
"Q. Approximately how many years is that? A. Seventeen or eighteen.
"Q. In connection with your duties as secretary to the Union or secretary to Mr. Fuglaar, what do you do, what services do you perform? A. Well, I keep the books, answer the telephone, or whatever has to be done in the office.
"Q. Do you sign any official documents of any kind? A. No.
"Q. You keep the records in connection with the Union's business activities? A. That's right.
"Q. Do you keep the records with respect to rental arrangements that are made between the Union and the various tenants that occupy the building? A. Yes, sir.
"Q. Do you collect the rents? A. Well, when the rent is paid in there, I post it. That's all I do.
"Q. Then actually, if the rent is paid to Mr. Fuglaar by check, he would turn it over to you for further handling, would he not? A. Yes, to be posted.
"Q. Posted, check deposited, and so forth? A. That's right.
"Q. Do you make the deposits to the bank account? A. Mr. Fuglaar does that.
"Q. Do you prepare it? A. I prepare it, yes.
"Q. Does he actually handle the deposits all himself? A. Yes."
From the foregoing testimony it seems clear Fuglaar was empowered to have the general control and management of the building, including the power to delegate such authority if he so desired. During his absence it would appear that Mrs. Vandersypen performed any office function pertaining to the duties of Fuglaar, and she had implied, if not express authority to open any door in the building affected by the interest of the defendant Union. *300 Though it is true Mahfouz was not a tenant, he did have the implied consent of the defendant Union to remove the vent from the wall of the building to which act he was directing his energies at the time of the accident. Accordingly, we think Mrs. Vandersypen was as fully authorized to open the door for Mahfouz as she would have been if the person so accommodated happened to be a tenant or employee in the building. For the reasons so stated, we are inclined to follow the principle adhered to in Employers' Fire Insurance Company v. Sparke, La.App.1952, 56 So.2d 882, and Travelers Fire Insurance Company v. Savoy, La.App.1955, 82 So.2d 68. It is, therefore, our finding that the doctrine of respondeat superior applies in this case.
This brings us to a discussion of what we consider the crucial issue, that is the negligence of Mrs. Estelle Vandersypen. In plaintiff's petition some seven specific charges of negligence were particularized, however, it is our appreciation of the record on appeal and as reflected in plaintiff's brief all of these charges have fallen save two, which are: "failing to warn petitioner that the door opened into an elevator shaft"; and "Opening the door and allowing and inviting petitioner to enter the same when it was known, or should have been known, by the Union's employee that the door opened to the open shaft." The record reveals Mahfouz did not know of the open elevator shaft at the threshold of the door, and that Mrs. Vandersypen did, in fact, know of its existence at the time she was engaged in unlocking the door.
The briefs of both parties have favored us with an extended discussion of and references to authorities upon the question of whether Mahfouz occupied the status of an invitee or licensee upon the premises. It is our opinion no important distinction should be made in this respect, irrespective of whether he was a licensee or invitee, he was entitled to receive an adequate warning of the danger which existed, from the employee of the defendant Union and it was incumbent upon her to exercise reasonable care to prevent injury to any person rightfully upon the premises. There can be no question but that Mahfouz had a right to be in the building.
Foreasmuch as any resolution or finding of negligence by Mrs. Vandersypen rests upon the nature of and the adequacy of the warning given, we have set forth pertinent testimony of the petitioner and of Mrs. Vandersypen. Mr. Mahfouz testified:
"Q. When she came down what did she tell you? A. She never say a word to me. She never say nothing. She opened the door and I went to put my foot in there and that's all.
"Q. She never said a word to you? A. Never said a word.
"Q.Now, she walked up to the door and she had the key. Is that correct? A. She had the key in her hand.
"Q. And she had a key ring that had several keys on it. Now, did the first key that she tried open the door? A. I don't know, because she is the one wasthe one wasI don't know.
"Q. You were present when this was happening? A. I was present, but I wasn't looking.
"Q. Who all was there? A. It was me and her, was all.
"Q. As she was trying to open the door, how were you standing with respect to her and the door? A. Just like the door right hereshe stand right here and I stand right there she open the door and I walked in.
"Q. Did the door open fromas you face that door, did the hinges open from the left or right? A. If I am not mistakenI don't remember now, but I think the hinges on the right of the door.
"Q. You think that the hinges are on the right? A. If I'm not mistaken.
"Q. Where were you standing? A. I was standing on her left. Yes.

*301 She was right there to open the door on her left. She opened the door and I walked in.
"Q. How far were you standing from her at that time? A. Oh, I don't know. Maybe twenty-four inches.
"Q. Just a normal distance of two people standing together? A. I would say maybe two feet and a half, something like that.
"Q. Foot and a half to two feet? A. Possible.
"Q. Well, you were standing right there. Just give me A. It was two feet maybeeighteen inchsomething like that.
* * * * * *
"Q. When you walked in, did you just walk straight in, or did you approach the thing cautiously, or how? A. Well, I had my (indistinct)the floor in there.
"Q. You had your what? A. I thought they was supposed to have a floor in the room. I don't know there was no floor in the room.
"Q. What made you think that that was a room? A. Well, I don't know. They put a storage rooms to put stuff. (Indistinct) There was a room in there. I don't know the elevator shaftit don't operate.
* * * * * *
"Q. When you proceeded in, was there any light shining into the room? A. No light at all. I don't see no lights.
"Q. You don't see no lights? It was absolutely dark in there? A. That's right.
"Q. And you walked right in, into the dark? A. Yes.
* * * * * *
"Q. Did you look down into this elevator shaft before you stepped in it? A. IIit so dark I can't see anything."
From Mrs. Vandersypen came the following testimony:
"Q. Would you tell us what happened? A. Yes, after he left, then I kept looking for the key and finally found it, so I went down the stairs and he was standing at the door and turning on the knob and saying something that I didn't understand, and I didn't even ask him what he had said. And so I had several keys in my hand and I tried the keys and the last one that I was getting ready to try, he grabbed hold of the knob and it wasn't unlocked yet,so I went ahead and unlocked it for him.
"Q. Where was this door located? A. Well, it was downstairs to the right after you came in off of the street.
"Q. The door knob itselfwhat side of the door was the doorknob on as you faced the door from where you were? A. On the right hand side.
"Q. The door knob was on the right, the hinge is on the left? A. On the left.
"Q. Go ahead, please. A. And I was standing to the right, unlocking the door, and as I unlocked it and opened it up, he was to my left, and I just turned, with my hand still on the door and he was just directly to my left, and I told him not to go in therethat there was a hole in there, it's deep, and that's all there is to it.
"Q. Then what did you do after that? A. Well, I just turned the door loose and stepped back and got ready to go on up the stairs. I didn't pay too much attention and before I got my eyes off of him, well, he just walked in.
"Q. Before he walked in, and when you told him about the hole, did he make any reply? A. No.

*302 "Q. Was he looking at you at the time? A. Well
"Q. Did it look like that he understood what you were telling him? Can you remember that? Or do you remember? A. Well, he acted like he uhhad understood or had heard me when I told him that
"Q. In what manner did he seem that way? A. Well, he just didn't say anything at allI didn't ask him any questions either.
"Q. Did you see him when he walked through the door? A. Yes.
"Q. Didwhat happened then after that, after he walked through? A. As he walked through, he went on to the bottom.
* * * * * *
"Q. What path did he use to walk into the doorway? A. Straight on in.
"Did he step in front of you? A. Well, he just stepped rightyou see I was to the right of the door, all the time. And, as I pushed it to my left, it was opening it, and it went on back completely wide open.
"Q. In other words, you weren't right in the middle of the doorthe door swung all the way back? A. All the way back and I was standing to the right of the door.
"Q. And he just started walking in and he was at all times approaching your left side? Is that correct? A. No, he was going straight on in.
"Q. Oh, I see. He was a little bit to the rear of you? A. Yes.
"Q. To the left rear? A. Yes."
The following is extracted from additional testimony by Mrs. Vandersypen:
"Q. Pushed the door with your left hand? He had stepped back a foot or so to permit the door to pass in front of himis that correct? A. Yes.
"Q. What, if anything, did you say to him? A. I just told him thatnot to walk in there, there is a hole, it's deep.
"Q. That was after you opened the door? A. That's right, and I just motioned with my right hand.
* * * * * *
"A. I told him not to walk in there as I opened the door and faced him.
"Q. Was he walking towards the door at that time? A. He hadn't started walking right at that time.
"Q. Where were you standing at that time? A. To the right of the door.
"Q. Did he then walk into the doorway? A. Yes.
"Q. How far were you from him? A. Well, I was right at the corner of the door.
"Q. In other words, you were closer really to the doorway than he was? A. Yes.
"Q. And you told him not to walk in there and he walked in anyway? A. Yes.
"Q. And he fell? A. Yes.
"Q. Did you make any effort at all to block his passageway or hold him or stop him? A. No."
William K. Ellington testified that immediately after the accident, at which time he was on the second floor of the building, Mrs. Vandersypen came hurrying up the stairs and he heard her crying or screaming and very much emotionally upset. Upon her coming into the room where he was, she said: "I begged that old man not to go in there." The witness stated he immediately went to the door of the elevator shaft just seconds after the occurrence of the accident. Counsel for plaintiff objected to the admissibility of this evidence, but it was admitted as part of the res *303 gestae. The ruling was proper. The latter term, according to 32 C.J.S. verbo Evidence § 403, pp. 19-20, is defined in a general way as meaning:
"* * * the circumstances, facts, and declarations which grow out of the main fact and serve to illustrate its character and which are so spontaneous and contemporaneous with the main fact as to exclude the idea of deliberation or fabrication, and it has been made to embrace all facts which are relevant to the principal fact in any degree as tending to establish the existence of a claim or a liability in dispute between the parties which directly arises, if, at all, from the primary fact. * * *"
Similar testimony was elicited from Mrs. Martha L. Brimer and Laurette Beilkewicz, but such testimony was by the judge a quo ordered stricken upon motion by counsel for plaintiff because of admissions of said witnesses of violating instructions of the court when the witnesses in the suit were sequestered and "placed under the rule." The exclusion, however, does not affect the weight which must be given the corroborating testimony by Ellington. It proved, we think, that Mrs. Vandersypen did tell Mahfouz "not to go in there * *."
The evidence, we find, establishes that Mrs. Vandersypen gave a timely warning to petitioner by telling him in an ordinary tone of voice not to go into the darkened room. At the time this warning was given, Mahfouz was standing within a few feet from the door and his hearing was not shown to be in any wise defective. Hence, it is plain that there was no reasonable excuse for failing to hear the words spoken to him. Counsel for plaintiffs raise also the question of whether such warning was sufficient to cause the petitioner to pause and hesitate before stepping beyond the threshold of the door and argue that Mrs. Vandersypen should have restrained him in some manner. We hold this argument is without merit. Mahfouz was a large man and although wearing eye glasses with thick lenses, the employee of the defendant Union cannot under any stretch of the imagination be held to have reasonably foreseen that her listener would, if he were listening, pay no heed to her words of warning. She stated she thought he was merely stepping up to the door in order to look beyond and we find no ground for holding such judgment to be unreasonable.
As a rule in the determination of liability in a tort action, a person with defective vision will be held to a greater degree of care than a person of normal vision when confronted with unfamiliar, dark surroundings. Thus in Curet v. Hiern, La. App.1957, 95 So.2d 699, 703, the court stated:
"After arising from bed plaintiff most probably was in a sleep-ladened condition and thoughtlessly moved about the darkened hallway. She could have turned on the light which would have illuminated the stairwell, but unfortunately she failed to do this. Then in the darkness she opened the door although professing she had never before attempted to use the stairway and it was entirely unfamiliar to her. We believe her conduct in proceeding through the door into total darkness was a most imprudent thing to do, and the case must fall within the `step in the dark' principle. This rule of law is thus stated in 1 Shearman & Redfield on Negligence, page 320:
"`A person who comes into an unfamiliar situation, where a condition of darkness renders the use of his eyesight ineffective to define his surroundings, is not justified, in the absence of any special stress of circumstances, in proceeding further, without first finding out where he is going and what may be the obstructions to his safe progress. Violation of that rule is contributory negligence as matter of law.'
"In Fahey v. Sayer, 9 Terry 173, 48 Del. 173, 99 A.2d 624, 625, the plaintiff *304 was held contributorily negligent as a matter of law in entering a darkened doorway, notwithstanding the fact that there was sufficient light in the hallway on which the door opened. The plaintiff had occasion to seek use of the lavatory in defendants' premises and went into a rear hall from which there were several doors, including doors leading to the kitchen, a den and a utility room. There were three other doors similar in appearance and structure except for one leading to a cellar stairway and it was distinguished by a bolt and a chain which was open at the time. Plaintiff went to the door leading onto the cellar steps, opened the door and reached her hand to see if she could find a light switch and, as she describes the accident `away I went down on my back to the bottom of the stairs.' The lower court directed a verdict for defendants and held plaintiff contributorily negligent as a matter of law. The appellate court affirmed the action of the lower court saying:
"`* * * The impenetrable darkness which confronted her when she opened the door leading to the cellarway was sufficient warning not to attempt to use it except at her own risk. * * *"
See also Briscoe v. Bailey, La.App.1954, 74 So.2d 770, 771, the opinion of which, in part, reads:
"* * * The plaintiff, wholly unfamiliar with the premises, opens a closed door revealing, according to her own testimony, nothing but darkness into which she imprudently advances and falls down the stairway. It was her own negligence that caused her mishap."
After a careful consideration of all phases of the testimony, both pro and con, bearing upon the negligence of Mrs. Vandersypen, we hold that she was not guilty of any act of negligence either of omission or commission which may be said to have been a proximate cause of the injury sustained by Mr. Mahfauz. The warning of Mrs. Vandersypen was unquestionably timely given when Mahfouz was not more than two steps away; and we can conceive of no reason why he did not pause and give some reflection to the meaning of these words of warning before he stepped beyond the range of his vision.
With this finding, that Mrs. Vandersypen was free of negligence, it is, of course, unnecessary to discuss the question of whether or not Mahfouz was contributorily negligent.
For the reasons aforesaid, the judgment from which appealed, is affirmed at appellant's cost.